## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| THE NORTHERN CHEYENNE TRIBE,<br><br>                Plaintiff,<br><br>   vs.<br><br><br>THE UNITED STATES OF AMERICA;<br>the UNITED STATES DEPARTMENT<br>OF THE INTERIOR; the BUREAU OF<br>INDIAN AFFAIRS; David<br>BERNHARDT, in his official capacity as<br>Secretary of the Interior; Darryl<br>LACOUNTE, in his official capacity as<br>Director of the Bureau of Indian Affairs;<br>Susan MESSERLY, in her official<br>capacity as Director of the BIA Rocky<br>Mountain Regional Office; Lenora<br>NIOCE, in her official capacity as BIA<br>Special Agent in Charge/Approving<br>Official;<br><br>                Defendants. | No. <u>CV-20-183-BLG-SPW</u><br><br><br><br>**COMPLAINT** |

Plaintiff, by and through the undersigned attorneys, for its Complaint against the Defendants, hereby alleges as follows:

1

INTRODUCTION

1.      This is an action by Plaintiff, the Northern Cheyenne Tribe ("Tribe"), seeking declaratory, mandamus, injunctive and equitable relief against the United States of America ("United States" or "Government") due to the Bureau of Indian Affairs' violation of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq*. ("ISDEAA") and its implementing regulations at 25 C.F.R. Part 900.

2.      Defendants violated the ISDEAA when they declined to enter into a self-determination contract with Plaintiff that would allow Plaintiff to assume operation of the Bureau of Indian Affairs' Criminal Investigation functions within Plaintiff's Reservation.

3.      Defendants improperly imposed non-regulatory requirements on Plaintiff as a condition of entering into a contract with Plaintiff, failed to adequately support the decision to decline Plaintiff's contract proposal, and failed to provide technical assistance to Plaintiff, all in contravention of the ISDEAA and its implementing regulations.

4.     Plaintiff seeks a declaration by this Court that Defendants violated the ISDEAA and an injunction ordering Defendants to accept Plaintiff's proposed contract, as well as its pre-award costs and other equitable relief.

PARTIES

5.     Plaintiff is a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934, 48 Stat. 987 (codified at 25 U.S.C. § 5123).   The Tribe adopted a Constitution in 1935, which established its Tribal Council as its governing body.  The Constitution and associated Bylaws were approved by the United States Assistant Secretary of the Interior on November 23, 1935.  The Tribe amended its Constitution and Bylaws in 1960 and again in 1996, both of which were approved by the Bureau of Indian Affairs.  Accordingly, the Tribe possesses all legal rights afforded to federally recognized Indian tribes including the right to enter into self-determination contracts under 25 U.S.C. §§ 5321(a)(1) and 5304(e).

6.     The Tribe governs and occupies the Northern Cheyenne Reservation in Montana.

7.     Defendant United States, acting by and through the Department of the Interior and the Bureau of Indian Affairs, as a matter of federal statutory, regulatory,

and common law, is trustee and a fiduciary to the Northern Cheyenne Tribe and is charged with carrying out trust and statutory duties and responsibilities to provide law and order within the Tribe's Reservation.

8.      Defendant United States Department of Interior ("DOI") is an executive department of the United States Government organized and existing under 5 U.S.C. § 101, as amended. Defendant DOI is responsible for, among other things, entering into self-determination contracts with Indian tribes to administer DOI's programs, functions, services and activities under 25 U.S.C. § 5321 and the supervision, management, direction, and oversight of Defendant Bureau of Indian Affairs, which is a federal agency subsidiary of the DOI, pursuant to the provisions of 43 U.S.C. § 1457(10).

9.      Defendant Bureau of Indian Affairs ("BIA" or "Bureau") is a subsidiary bureau within DOI. Defendant BIA is responsible for administering federal Indian policy; fulfilling its federal trust responsibilities to American Indians, tribal governments, and Alaska Natives; and promoting tribal self-determination and self-governance.

10.     Defendant David Bernhardt, or his successor, is the Secretary of the Department of Interior of the United States of America (the "Secretary") and is

4

being sued in his official capacity as an officer and agent of the United States Government. The Secretary, as head of an executive department, reports directly to the President of the United States, *see* 43 U.S.C. § 1451, and is responsible for directing and supervising all operations and activities of DOI, including entering into self-determination contracts with tribes under 25 U.S.C. §§ 5321 and 5304(i).

11.    Defendant Darryl LaCounte, or his successor, is the Director of the Bureau of Indian Affairs.  As Director, he provides direction and coordination of the Bureau's responsibilities in the implementation of the ISDEAA.  Indian Affairs Manual, Part 13, Ch.2, § 1.5.A.

12.    Defendant Susan Messerly, or her successor, is the Regional Director of the Bureau's Rocky Mountain Regional Office.  As Regional Director, she provides for the application of overall policies, procedures and implementation of self-determination services awards within her administrative jurisdictional area pursuant to governing statutes and established policies and procedures, and is responsible for providing technical assistance to tribes. Indian Affairs Manual, Part 13, Ch.2, § 1.5.D.

13.    Defendant Lenora Nioce or her successor is a Special Agent in Charge within the Bureau's Office of Justice Services, District V, and was the Bureau

official designated as the "Approving Official" for the Tribe's ISDEAA proposal, and who issued the contract declination and related correspondence that form the basis of this Complaint.   Approving Officials are responsible for, *inter alia*, determining the contractibility of Bureau programs, services and functions or portion thereof; identifying potential declination and/or trust protection issues in contract proposals; approving or declining the contract/grant proposal pursuant to statute and requirements outlined in 25 C.F.R. §900; ensuring program objectives are consistent within authorizing legislation and appropriation language; and providing technical assistance to Indian tribes and tribal organizations in support of self-determination contracting.  Indian Affairs Manual, Part 13, Ch. 2, § 1.5.F.

## JURISDICTION

14.   This Court has jurisdiction over the subject matter under 28 U.S.C. § 1331, 1361 and 1362 because this is a civil action arising under the laws of the United States, including 25 U.S.C. § 5321, and is brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior, to compel Defendants to perform duties owed to Plaintiff.  Under 25 U.S.C. §§ 5321(b)(3) and 5331, the Court has jurisdiction over an action initiated in federal district court by

a tribe seeking a hearing on the Secretary's decision to decline an ISDEAA contract proposal.

15.   The Government has waived its sovereign immunity under 25 U.S.C. § 5331 because this is an action in federal court seeking relief against an action by an officer of the United State or an agency thereof contrary to the ISDEAA seeking immediate injunctive relief to reverse a declination finding under 25 U.S.C. § 5321(a)(2) and to compel the Secretary of the Interior to award and fund a self-determination contract.

## VENUE

16.   Venue is proper in the District of Montana under 28 U.S.C. §§ 1391(b) and (e) because an officer or employee of the United States is a defendant and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## APPLICABLE LAW

### Indian Self-Determination and Education Assistance Act

17.    In enacting the ISDEAA, Congress recognized the Government's obligation to assure maximum Indian participation in the direction of federal services to Indian communities, and its commitment to an orderly transition from

federal domination of Indian services to effective and meaningful participation by Indian tribes in the planning, conduct and administration of services to Indian communities.  25 U.S.C. § 5302.

18.     The Secretary is directed, upon the request of any Indian tribe, to enter into a self-determination contract to plan, conduct and administer programs or portions thereof for the benefit of Indians because of their status as Indians, without regard to the agency or office of DOI within which the program or service is performed.  25 U.S.C. § 5321(a)(1)(E).

19.     The programs, functions, services, or activities that are contracted under 25 U.S.C. § 5321(a)(1) shall include administrative functions of DOI that support the delivery of services to Indians, without regard to the organizational level within the Department that carries out such functions.  25 U.S.C. § 5321(a)(1).

20.     The Secretary is required, at all times, to negotiate self-determination contracts in good faith to maximize the policy of tribal self-determination and carry out the ISDEAA in a manner that maximizes the policy of tribal self-determination. 25 U.S.C. § 5321(f).

21.     The Secretary is required to provide technical assistance upon request by a tribe to develop a new self-determination contract, to provide for tribal

assumption of a program under 25 U.S.C. § 5321 or to modify a self-determination contract proposal after a Secretarial declination. 25 U.S.C. § 5322(d).

22.    A self-determination contract proposal shall include the standards under which the tribal organization will operate the contracted program, service, function, or activity, 25 U.S.C. § 5321(a)(2), and applicable program standards shall also be set forth in the final contract with the tribe, 25 U.S.C. § 5324(a)(2).

23.    25 C.F.R. § 900.8 lists the information a tribe's initial contract proposal must contain, including: a description of the proposed program standards (§ 900.8(g)(4)); minimum staff qualifications proposed (§ 900.8(g)(7)); and a statement that the tribe will implement procedures appropriate to the programs proposed to be contracted as otherwise required by law (§ 900.8(m)).

24.    The Secretary may not require a tribe to submit any other information beyond that identified in 25 C.F.R. §900.8.  25 C.F.R. § 900.9.

25.    The Secretary may not impose any nonregulatory requirements relating to the approval, award or declination of self-determination contracts, 25 U.S.C. § 5328(a)(1), or  require tribes to "abide by any unpublished requirements such as program guidelines, manuals or policy directives of the Secretary, unless

otherwise agreed to by the Indian tribe" or otherwise required by law, 25 C.F.R. § 900.5.

26.     If the Secretary considers a tribal proposal for a self-determination contract and determines that the tribe lacks adequate internal controls necessary to manage the contracted program or programs, the Secretary shall, as soon as practicable, provide the necessary technical assistance to assist the tribe in developing adequate internal controls—including development of a plan for assessing the subsequent effectiveness of such technical assistance. 25 U.S.C. § 5324(q). The inability of the Secretary to provide technical assistance or lack of a plan shall not result in the declination or rejection of a new contract. *Id.*

27.     The amount of funds provided under the terms of self-determination contracts shall not be less than the Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within DOI at which the program, including supportive administrative functions that are otherwise contractable, is operated.  25 U.S.C. § 5325(a).

28.     Once a tribe submits a proposal for a self-determination contract, the Secretary shall, within ninety days after receipt of the proposal, approve the

proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that:

28.1   the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory, 25 U.S.C. § 5321(a)(2)(A) and 25 C.F.R. § 900.22(a);

28.2   adequate protection of trust resources is not assured, 25 U.S.C. § 5321(a)(2)(B) and 25 C.F.R. § 900.22(b);

28.3   the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract, 25 U.S.C. § 5321(a)(2)(C) and 25 C.F.R. § 900.22(c);

28.4   the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under 25 U.S.C. § 5325(a), 25 U.S.C. § 5321(a)(2)(D) and 25 C.F.R. § 900.22(d); or

28.5   the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities because the proposal includes activities that cannot lawfully be carried out by the contractor. 25 U.S.C. § 5321(a)(2)(E) and 25 C.F.R. § 900.22(e).

29.     The Secretary may only decline a contract proposal for the reasons listed in 25 U.S.C. § 5321(a)(2) and 25 C.F.R. § 900.22.  25 C.F.R. § 900.24.  The Secretary cannot decline any proposal based on any objections "that will be overcome through the contract." 25 C.F.R. § 900.23.

30.     The Secretary is required to provide any necessary requested technical assistance to a tribe, and share all relevant information with the tribe, to avoid declination of a proposal.  25 C.F.R. § 900.28.

31.     The Secretary is required to provide additional technical assistance to overcome stated objections to a declined proposal, and to develop any modifications to overcome the stated objections. 25 C.F.R. § 900.30.

32.     The Secretary shall approve any severable portion of a contract proposal that does not support a declination finding described under 25 U.S.C. § 5321(a)(2); thus, if a tribe submits a contract proposal that proposes a level of funding that is in excess of the applicable level determined under 25 U.S.C. § 5325(a), the Secretary shall approve the contract with a level of funding authorized under section 5325(a).  25 U.S.C. § 5321(a)(4).

33.     A tribe may request reimbursement for pre-award costs, so long as the Secretary receives written notification of the nature and extent of the costs prior to

the date on which such costs are incurred.   25 C.F.R. § 900.7; 25 U.S.C. § 5322(a)(2); 25 U.S.C. § 5325(a)(6).   Upon approval of a self-determination contract, the full amount of funds to which the Tribe is entitled under § 5325(a), which includes pre-award costs, shall be added to the contract. 25 U.S.C. § 5325(g).

34.     The Bureau's policy on pre-award costs requires only that the Tribe submit "prior written notice of the nature and extent of the costs before they are incurred."  Indian Affairs Manual, Part 13, Ch. 7, § 1.7.  The Bureau is to provide technical assistance to discuss eligible pre-award costs.  *Id.*

35.     Under 25 U.S.C. § 5321(b), if the Secretary declines a contract proposal, the Secretary is required to state any objections in writing to the tribe; provide assistance to the tribe to overcome the state objections; and provide the tribal organization with a hearing on the record with the right to engage in full discovery relevant to any issue raised in the matter and the opportunity for appeal on the objections raised, under such rules and regulations as the Secretary may promulgate, except that the tribe may, in lieu of filing such appeal, exercise the option to initiate an action in a federal district court and proceed directly to such court pursuant to 25 U.S.C. § 5331(a).

36.   The Secretary is also required to provide a tribe with any documents relied upon in making the declination decision, within 20 days of the decision.  25 C.F.R. § 900.29(a).

37.   In the federal district court, tribes may seek appropriate relief including money damages; injunctive relief against any action by an officer of the United States or any agency thereof contrary to the ISDEAA or its implementing regulations; or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under the ISDEAA or its implementing regulations, including immediate injunctive relief to reverse a declination finding under 25 U.S.C. § 5321(a)(2) or to compel the Secretary to award and fund an approved self-determination contract. 25 U.S.C. § 5331.

38.   The ISDEAA is to be liberally construed for the benefit of the tribe participating in self-determination, and all ambiguity shall be resolved in favor of the tribe.  25 U.S.C. § 5321(g).

Indian Country Law Enforcement

39.   The Indian Law Enforcement Reform Act (ILERA), Pub. L. No. 101-379 (25 U.S.C. 2801 *et seq*.), establishes and memorializes the federal government's duty to provide law enforcement services to tribes, including

standards for education, experience and background checks of tribal law enforcement officers

40.   25 U.S.C. § 2802(d)(1) requires the Secretary to "establish within the Office of Justice Services a separate Branch of Criminal Investigations which, under such inter-agency agreement as may be reached between the Secretary and appropriate agencies or officials of the Department of Justice and subject to such guidelines as may be adopted by relevant United States attorneys, shall be responsible for the investigation, and presentation for prosecution, of cases involving violations of sections 1152 and 1153 of title 18, United States Code, within Indian country."

41.   In the ILERA, Congress expressly supported contracting of criminal investigation functions to tribes.  25 U.S.C. § 2802(d)(4)(i) provides that while BIA criminal investigative personnel "shall be subject only to the supervision and direction of law enforcement personnel of the Branch [of Criminal Investigations] or the Office of Justice Services," "[n]othing in this paragraph is intended to . . . prohibit or restrict the right of a tribe to contract the investigative program under the authority of Public Law 93-638 or to maintain its own criminal investigative operations."

42.    Under 25 U.S.C. § 2805, DOI is authorized to, "[a]fter consultation with the Attorney General of the United States,  . . . prescribe under this Act regulations relating to the enforcement of criminal laws of the United States and regulations relating to the consideration of applications for contracts awarded under the Indian Self-Determination Act to perform the functions of the Branch of Criminal Investigations."  However, no such regulations have been promulgated.

43.    25 U.S.C. § 2802(e)(1) requires the Secretary to "establish appropriate standards of education, experience, training, and other relevant qualifications for law enforcement personnel of the Office of Justice Services who are charged with law enforcement responsibilities pursuant to section 4 [25 USC § 2803]" but provides that "[l]aw enforcement personnel of the Office of Justice Services or an Indian tribe may satisfy the training standards established under subparagraph (A) through training at a State or tribal police academy, a State, regional, local, or tribal college or university, or other training academy (including any program at a State, regional, local, or tribal college or university) that meets the appropriate Peace Officer Standards of Training."

44.   BIA's Office of Justice Services is required to develop standards and deadlines for the provision of background checks to tribal law enforcement and corrections officials.  25 U.S.C. § 2802(e)(4)(A).

45.   If a request for a background check is made by an Indian tribe that has contracted or entered into a compact for law enforcement or corrections services with the Bureau of Indian Affairs pursuant to the ISDEAA, the Bureau's Office of Justice Services shall complete the check not later than 60 days after the date of receipt of the request, unless an adequate reason for failure to respond by that date is provided to the Indian tribe in writing.  25 U.S.C. § 2802(e)(4)(B).

46.   Tribal law enforcement programs receiving federal funding are required to adhere to polices and standards set forth in 25 C.F.R. Part 12.  25 C.F.R. § 12.11.

47.   Indian country law enforcement programs that receive federal funding and/or commissioning will be subject to a periodic inspection or evaluation to provide technical assistance, to ensure compliance with minimum federal standards, and to identify necessary changes or improvements to BIA polices.  25 C.F.R. § 12.12.

48.   All Indian country law enforcement programs receiving federal funding and/or authority must ensure that all law enforcement officers successfully complete a thorough background investigation no less stringent than required of a federal officer performing the same duties.   25 C.F.R. § 12.32.   In addition, background investigations of applicants and employees must be adjudicated by trained and qualified security professionals, and all background investigations must be documented and available for inspection by the Bureau of Indian Affairs.   *Id.*

49.   Law enforcement personnel of any program funded by the Bureau of Indian Affairs must not perform law enforcement duties until they have successfully completed a basic law enforcement training course.   25 C.F.R. § 12.35.

50.   The Bureau's agency superintendent must ensure technical support is provided to any agency contracting the Bureau's law enforcement program.   25 C.F.R. § 12.4.

ALLEGATIONS

The Northern Cheyenne Reservation

51.   The Northern Cheyenne Tribe of Montana has approximately 12,000 members.    The Northern Cheyenne Indian Reservation ("the Reservation") is located in present-day southeastern Montana, and is approximately 444,000 acres

in size with 99% tribal ownership.   Approximately 5,000 members of the Tribe

reside on the Reservation.   The Reservation is located in the counties of Big Horn

and Rosebud.

52.    The Northern Cheyenne Reservation was first established by Executive

Order dated November 26, 1884, under the administration of Chester A. Arthur and

extended March 19, 1900, under the administration of William McKinley.  In 1926,

Congress passed the Northern Cheyenne Allotment Act to secure the Reservation's

land and resources "for the permanent use and occupation of the Northern Cheyenne

Indians" by declaring that all property within the Reservation belongs to the Tribe.

44 Stat. 690 (June 3, 1926).

53.   The Northern Cheyenne Reservation is Indian country under 18 U.S.C.

§ 1151.

<u>Law Enforcement at Northern Cheyenne</u>

54.   The Bureau is solely responsible for providing law enforcement

services on the Tribe's Reservation, including uniformed patrol officers,

dispatchers and criminal investigators.  All police officers on the Reservation are

currently funded, employed and managed by the Bureau of Indian Affairs.

55.    Currently, the Tribe faces unacceptable levels of violent crime, crimes against children and vulnerable adults, and drug-related crime with the Reservation. This has been true for many years.

56.    The Tribe has been dissatisfied with the level of law enforcement service provided by the Bureau for several years and has attempted to work with the Bureau to address the issues, including a lack of qualified officers assigned to the Reservation and a lack of adequate criminal investigations.

57.    According to BIA's Office for Justice Services, Northern Cheyenne should have the following 19 law enforcement staff in addition to criminal investigators: 1 chief of police, 2 lieutenants, 2 drug enforcement officers, and 14 police officers.  Over the last several years, there has been an average of less than 6 such staff assigned to the Reservation.  Sometimes, there is a single officer on duty at a time.   Thus, it is often impossible to address more than one incident of crime at a time.  In addition to responding to incidents all over a large Reservation, there is currently no detention facility on the Reservation, with the closest being anywhere from 30 to 90 miles away, depending from which part of the Reservation one travels. Thus, transporting offenders to far-off detention facilities is time consuming and takes away from other important duties like patrols, responding to calls, writing up

reports to support investigations and prosecutions and attending court hearings.  The officers that are assigned to the Reservation are over-worked and therefore less efficient and effective.  And when working by themselves, without backup support, the officers are more at risk.  Due to these challenges, the turnover rate of staff assigned to the Northern Cheyenne Reservation is high.

58.   Many crimes committed within the Reservation are not properly investigated.  This is due in part to the Bureau's failure to employ two criminal investigators at Northern Cheyenne.  Without proper investigation, the crimes are not prosecuted and the offenders are free to continue to engage in criminal conduct.

<u>The Tribe's Self-Determination Contract Proposal</u>

59.   On July 20, 2020, the Tribe submitted a letter of intent and authorizing Tribal Council resolution to the Bureau informing of the Tribe's intent to submit a self-determination contract proposal for the Bureau's criminal investigation functions.  The Tribe's letter of intent is attached to this Complaint as Exhibit 1.  The Tribe requested information from the Bureau about the criminal investigation ("CI") program, including all FY 2020 and FY 2021 budgets of funding available to the Bureau to provide law enforcement services for the benefit of the Tribe and its members; the total number of full-time employees; a property/equipment

inventory of all items used to provide program services to the Tribe; copies of all position descriptions; and services provided by the Bureau including calls for service and uniform crime reports for the previous six months.  Ex. 1 at 3.

60.    Having heard nothing in response, on August 10, 2020, the Tribe's point of contact for the CI contract proposal inquired via email to Defendant Nioce as to the status of the Tribe's request.  Defendant Nioce replied that the Bureau had not received a contract proposal from the Tribe, only a letter of intent.  Defendant Nioce did not provide any of the documents requested by the Tribe in its July 2020 letter.

61.    On August 19, 2020, the Tribe submitted a proposal to the Bureau to contract for Tribal assumption of the Bureau's Criminal Investigation and Division of Drug Enforcement functions within the Northern Cheyenne Reservation. The Tribe's proposal is attached to this Complaint as Exhibit 2.  The Tribe indicated that, if awarded the contract, the Tribe's minimum staff qualifications for the program's investigative staff would be commensurate with qualifications currently required by the Bureau.  Ex. 2 at 2 (item (7)).  The Tribe requested a first-year budget of $1,178,185.  *Id.* at 4 (item (H)(1)).  The Tribe also requested pre-award costs of $50,000 for the period of June 1, 2020 through September 30, 2020.  *Id.* at

4-5 (Item (H)(4)).   The Tribe confirmed that it would implement procedures appropriate to the program, assuring the confidentiality of information as required by law.  *Id.* at 5-6 (Item (m)).

62.   In its Scope of Work attached to the proposal, the Tribe noted that the Tribe was proposing to contract for the Bureau's CI and Division of Drug Enforcement ("DDE") programs because the Reservation is experiencing a tremendous problem with illegal drugs and associated criminal activity that threatens the health, welfare, comfort and safety of the Tribe and its members.  Ex. 2 at 9.  The Tribe stated its commitment to reducing the use, manufacture and distribution of dangerous drugs within the Reservation.   *Id.*   The Tribe acknowledged that investigators would be required to work closely with Tribal, federal and state law enforcement during criminal investigations and would work in cooperation and conjunction with the Bureau.  *Id.* at 9-10.  The Tribe also confirmed that the Tribal Investigative Services program would utilize the Bureau's standards for CI and DDE program functions under the contract, *id.* at 10.

63.   The Tribe's proposal indicated that Criminal Investigators hired under the contract would be required to complete criminal investigator training and any other mandatory training, to meet initial and continued qualifications in the use of

firearms, to pass a physical condition examination, and to successfully complete a background security investigation.  Ex. 2 at 18-19.

64.   The Tribe's proposed budget included costs to send investigators hired by the Tribe to obtain required training if necessary. Ex. 2 at 24.

<u>The Bureau's Response to the Tribe's Contract Proposal</u>

65.   BIA wrote to the Tribe on September 11, 2020 and outlined four deficiencies in the proposal.  BIA requested that the Tribe "correct, submit or provide clarification for the following items" under 25 CFR § 900.15.  BIA's letter is attached to this Complaint as Exhibit 3.

66.   First, BIA requested a "revised proposal that includes a request to contract only the CI program, with a revised budget and funding request for $203,846. Include an itemized budget to identify planned use of funding for personnel/fringe benefits and other associated costs to carry out the CI PFSA."  Ex. 3 at 1. BIA noted that "[t]he Tribe's proposed contract includes a budget request for funding direct operation of the CI program and the DDE Program in the amount of $1,198,823" but that "[t]he DDE Program is a central office function which is ineligible for contracting."  *Id.* (citing the Further Consolidated Appropriations Act

of 2020, Pub. L. No. 116-94, 133 Stat. 2534, 2701 (Dec. 20, 2019)).[1] BIA informed

the Tribe that "[t]he BIA OJS FY2020 base funding allocation (Secretarial level

amount) . . . for the CI program for the Northern Cheyenne Tribe is $203,846." *Id.*

67.    Second, BIA requested that the Tribe "[p]rovide the names of personnel

who will be hired as sworn officers for CI positions and a detailed plan on how the

Tribe will complete pre-employment background investigations and adjudication of

background investigations as required by 25 U.S.C. § 2802(e)(4)(A) and 25 CFR §

12.32." Ex. 3 at 2.  BIA also sought

> a detailed description for how you plan to ensure that the personnel you
> hire have completed the required basic training requirements for a
> certified police officer under 25 U.S.C. § 2802(e)(l) and mandatory
> training requirements for a CI position for all personnel who will be
> working within the CI program per Section IV (4) of the Memorandum
> of Understanding (MOU) [Between the U.S. Department of the Interior
> Bureau of Indian Affairs and the U.S. Department of Justice, Federal
> Bureau of Investigation], which states: "Any contracts awarded under
> ISDEAA to perform the function of the BIA, Branch of Criminal
> Investigators, must comply with all standards applicable to the Branch
> of Criminal Investigators, including (b). Criminal Investigators must be

---

[1] The relevant section of the 2020 Appropriations Act at 133 Stat. 2701 states:

> Notwithstanding any other provision of law, no funds available to the Bureau of
> Indian Affairs or the Bureau of Indian Education for central office oversight and
> Executive Direction and Administrative Services (except executive direction and
> administrative services funding for Tribal Priority Allocations, regional offices, and
> facilities operations and maintenance) shall be available for contracts, grants,
> compacts, or cooperative agreements with the Bureau of Indian Affairs or the
> Bureau of Indian Education under the provisions of the Indian Self-Determination
> Act or the Tribal Self-Governance Act of 1994 (Public Law 103–413).

> certified Peace Officers and must have satisfactorily completed the basic Criminal Investigator course provided by the DOT at the Federal Law Enforcement Training Center, or an equivalent course approved by the BIA."

*Id.* BIA stated that this information was needed because "[t]he Tribe must be ready to assume the CI program upon BIA OJS approval of the initial contract proposal. This entails the hiring of personnel, the completion of background investigations (BIs) that are no less stringent than that of a federal officer performing law enforcement duties (including adjudication of BIs by a qualified/trained adjudicator) as required by 25 U.S.C. § 2802(e)(4)(A) and 25 C.F.R. § 12.32, and completion of minimum required basic training requirements as described in 25 U.S.C. § 2802(e)(l)." *Id.* BIA asserted that the Tribe's "TAP Kiosk does not meet the minimum federal BI and adjudication requirements for a certified law enforcement officer position. The S[cope] O[f] W[ork] does not provide a plan on how the Tribe plans to complete the required background investigations and adjudications of hired employees to comply with minimum standard BI requirements." *Id.*

68.    BIA did not provide the Tribe with a copy of the BIA-FBI MOU cited in Exhibit 3 and described in paragraph 67 above.

69.    Third, BIA's letter requested that the Tribe

26

[s]ubmit a revised and/or updated clarifying SOW or other documentation which demonstrates that the Tribe's criminal investigators will be required to request and be issued a Special Law Enforcement Commission (SLEC) under 25 U.S.C. § 2804 before assuming CI duties, that all criminal investigators employed by the Tribe will be adequately supervised by an individual appropriately trained in criminal investigative techniques, and protocols for information sharing, referrals and tracking of cases, dispatch protocols, and the handling of evidence.

Ex. 3 at 3.

70.    Fourth, BIA informed the Tribe that

[p]rior to approval of this proposal OJS will require a written agreement between the Tribe and the affected divisions within OJS, to include the District V Office and Bureau of Criminal Investigation, that provides processes and outlines authorities for supervision and technical assistance to Tribal criminal investigators by the OJS BCI and which includes how coordination of all other law enforcement functions retained by BIA OJS will be carried out.

Ex. 3 at 3.

71.    BIA stated that these requests were required to ensure that "law enforcement services provided to the residents and visitors of the Northern Cheyenne Indian Reservation are satisfactory," that "the Tribe's Criminal Investigative Service [has] appropriate commissioning and adequate supervision by qualified supervisory personnel," and that the CI program "work[s] efficiently with the remaining federally operated BIA law enforcement program(s) on the Northern

Cheyenne Reservation." Ex. 3 at 2. BIA observed that the Tribe's proposal lacked "a plan for tribal investigators to obtain federal commissioning, supervision by qualified personnel, or details of how the Tribe will work with the remaining OJS law enforcement programs, particularly with regard to the sharing of information, referral of cases for investigation, dispatch protocols, and the maintenance of evidence needed by both the Uniform Police and Criminal Investigation programs." *Id.* According to BIA, this issue apparently arises because the Tribe sought to contract only for the CI program and not for "Uniform Law Enforcement, Corrections and Dispatch" functions, which would remain with BIA. *Id.*

72.    Finally, BIA requested "clarification or further justification addressed to the BIA Awarding Official at the Rocky Mountain Regional Division of Self-Determination" regarding the Tribe's request for pre-award costs of $50,000 for the period of June 1, 2020 through September 30, 2020. *Id.* at 4. BIA noted that pre-award costs may not be included in the proposal if BIA does not receive written notification of the nature and extent of those costs prior to the date on which the costs are incurred and thus disallowed any pre-award costs prior to August 19, 2020. *Id.* (citing 25 U.S.C. § 5325(a)(6)).

73.   BIA requested that the Tribe "submit all missing items and written responses with clarifications" by September 28, 2020. *Id.*   BIA also noted that should the Tribe's proposal be approved, there is a "180 day phase-in period for newly contracted tribal CI programs" to "ensure an orderly transition from one law enforcement agency to the other." *Id.* (citing 25 U.S.C. § 2802(d)(l); 25 U.S.C. § 2804(a)(3)(B)(i), and a BIA-FBI MOU).

74.   The Tribe requested technical assistance from BIA via letter on September 17, 2020, which is attached to this Complaint as Exhibit 4.

75.   The Tribal President, Tribal Administrator, Tribal staff who prepared the contract proposal and the Tribal Attorney spoke to BIA officials, including Defendant Nioce, on September 28, 2020.  Defendants indicated that Defendant Nioce was the decisionmaker in terms of accepting or declining the Tribe's proposal.   Defendants agreed to provide the Tribe with sample agreements referenced in its letter and in paragraphs 67-70 above.  Otherwise, Defendants just reiterated the requests contained in the Bureau's September 11 letter without providing meaningful technical assistance to the Tribe.

The Tribe's Reply to the Bureau's Requests

76.   The Tribe sent a letter to BIA on October 9, 2020, which is attached to this Complaint as Exhibit 5.

77.   In response to BIA's first request for a revised budget, the Tribe informed BIA that it "proposed a larger budget based on the information available to it at the time, which was very limited because [BIA] failed to provide budgetary information about the CI program," which the Tribe had requested in July 2020, including "budgets for FY 2020 and 2021; the current FTEs and copies of position descriptions; a description of all services provided; and the equipment and supplies available to the program."  Ex. 5 at 1.  The Tribe "re-requested" that information and reiterated that the "most important information we need are the allocation tables for District V Northern Cheyenne Agency for all of law enforcement and criminal investigation and the organizational chart of personnel.  We cannot provide a revised budget until we get this information.  BIA is required to provide this information to the Tribe under 25 CFR §§ 900.3, 900.7, and 900.8, and other applicable law."  *Id.*

78.   In response to BIA's second request for the names of personnel who will be hired as sworn officers for CI positions and a detailed plan on how the Tribe

will complete pre-employment background investigations and adjudication of background investigations as well as a detailed description of how the Tribe plans to ensure that the personnel hired have completed the required basic training requirements for a certified police officer and mandatory training requirements for a CI position, the Tribe observed that it is not required to provide that information per 25 C.F.R. §§ 900.8 and 900.9.  Ex. 5 at 1-2. As to the names of individuals who will be hired under the contract, the Tribe stated that it will "hire people once the contract is awarded" and 25 C.F.R. § 900.8 does not require a tribe's proposal to name the individuals who will be hired.  Ex. 5 at 1.

79.   The Tribe reiterated that 25 C.F.R. § 900.8 and 900.9 do not allow BIA to request a "detailed plan" of how the Tribe will complete background investigations and adjudications or ensure individuals complete mandatory training required by applicable law and a memorandum of understanding. Ex. 5 at 1-2. Instead, § 900.8 requires the Tribe to affirm it "will implement procedures appropriate to the programs, functions, services or activities proposed to be contracted, assuring the confidentiality of medical records and of information relating to the financial affairs of individual Indians obtained under the proposed contract, or as otherwise required by law."  The Tribe affirmed that it would do so

and that "once the contract is awarded to the Tribe, it will comply with all applicable legal requirements including in its hiring and training practices." Ex. 5 at 2; *see also* paragraphs 61 through 64, *supra* (citing Ex. 2 at 2 (item (7)), at 5-6 (Item (m)), at 10, 18-19 and 24).

80.     As to BIA's third request for documentation to clarify that the Tribe's criminal investigators will be required to request and be issued a SLEC before assuming CI duties and will be supervised by an individual appropriately trained in criminal investigation techniques and protocols for information sharing, referrals, and tracking of cases, dispatch protocols, and the handling of evidence, the Tribe confirmed that the Tribe will carry out the above.  Ex. 5 at 2; *see also* paragraph 62, *supra* (citing Ex. 2 at 9-10).

81.     The Tribe again requested a copy of the BIA-FBI MOU cited in footnotes 2 and 3 of the September 11 letter (Ex. 3), and an agreement that BIA-OJS "has used to cover the requirements set forth in the second full paragraph of page 3 of your letter," *i.e.*, the requirement for a pre-contract agreement between the Tribe and BIA regarding how Tribal CIs would work with law enforcement functions retained by BIA.  Ex. 5 at 2. BIA previously promised to provide those documents to the Tribe during the September 28 technical assistance call.

82.    Finally, the Tribe clarified that pursuant to 25 C.F.R. § 900.7, it requested $50,000 for pre-award costs to begin to build the CI program, including job advertising, developing systems, and any work to complete the contracting process.  Ex. 5 at 2.

<u>The Bureau's Final Reply to the Tribe</u>

83.    Over one month after the Tribe's letter, and a mere four days before BIA's deadline to respond to the Tribe's ISDEAA proposal, BIA responded via letter on November 13, 2020, which is attached to this Complaint as Exhibit 6.  With that letter, BIA provided, for the first time, the information requested by the Tribe four months earlier in its July 2020 letter of intent, and some of the information the Tribe requested on September 28 and October 9 for purposes of revising the budget for the CI program.  BIA indicated that it has funding for two criminal investigator positions at Northern Cheyenne, Ex. 6 at 4 and 8; however, the documents provided confirmed that only one of the positions is currently filled.  *See* Ex. 6 at 5-7.

84.    BIA indicated that because the 25 U.S.C. § 5325(a)(1) funding amount for the CI program is $203,486, the Tribe's proposed funding level in excess of that amount was subject to partial declination.  Ex. 6 at 1.

85.   BIA indicated that information requested regarding background investigation materials and training certificates for law enforcement staff was necessary "to avoid a potential declination issue under 25 U.S.C. § 5325(a)(2)(A) and 25 C.F.R. § 900.22(a)" because "[*t*]*he service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory*." Ex. 6 at 2 (emphasis in original).   BIA stated that the CI program is "an essential service for public safety" that "cannot have a lapse in operations while transitioning to Tribal management," and that a "lack of qualified staff to carry out this function immediately upon award of the contract would endanger" public health and safety. *Id.*   BIA did not mention the 180-day phase-in period for the CI program previously described by the Bureau, *see* Ex. 3 at 3, or respond to the Tribe's contention that it intended to adhere to all applicable laws regarding hiring and training requirements, *see* Ex. 5 at 2.

86.   In addition, BIA asserted that "[*t*]he minimum standards for background investigations and law enforcement training are discussed at length in our September 11 letter, and in the attached [doc]." Ex. 6 at 2.   However, BIA's September 11 letter referred solely to requirements contained in a BIA-FBI MOU

that BIA never provided to the Tribe, *see* Ex. 3 at 2, and no such document was attached to the Bureau's November 13 letter.

87.   BIA stated that in addition to the Tribe's written commitment to comply with the requirement that all criminal investigators would be supervised only by law enforcement personnel, BIA required the Tribe to revise its statement of work to "provid[e] that all criminal investigators employed by the Tribe will be adequately supervised by an individual appropriately trained in criminal investigative techniques, and protocols for information sharing, referrals and tracking cases, dispatch protocols, and the handling of evidence." Ex. 6 at 2. BIA indicated that it provided a sample of acceptable language; however, no such sample was provided with the letter.  BIA indicated that failure to address the issue as BIA requested would result in declination under 25 C.F.R. § 900.22 (a) and (d).

88.   BIA's November 13 letter did not discuss the Tribe's request for pre-award costs or contend that the information regarding the nature and extent of costs disclosed in the Tribe's October 9 letter was insufficient, nor did BIA offer technical assistance to discuss eligible pre-award costs.

89.   BIA requested an extension of the 90-day deadline to respond to the Tribe's proposal, which the Tribe refused by letter dated November 16, 2020 stating

that if the Tribe's proposal was denied, BIA would be violating the ISDEAA.  That letter is attached to this complaint as Exhibit 7.

<u>The Bureau's Unlawful Declination of the Tribe's Proposal</u>

90.    BIA declined the Tribe's proposal on November 17, 2020, citing 25 U.S.C. §§ 5321(a)(2)(A), (C), (D) and (E) as the reasons for its declination.  That declination letter is attached to this Complaint as Exhibit 8.  As explained below, each of the reasons supplied by BIA for declining the contract violated the ISDEAA.

91.    First, BIA declined the contract for Division of Drug Enforcement functions under 25 U.S.C. § 5321(a)(2)(E) on the erroneous basis that "[t]he DDE program is a central office function that is ineligible for contracting."  Ex. 8 at 2 (citing the Further Consolidated Appropriations Act of 2020, Pub. L. No. 116-94, 133 Stat. 2534, 2701 (Dec. 20, 2019)).  In fact, the DDE functions are funded as part of the Bureau's Public Safety and Justice appropriation and are not part of the Bureau's central office oversight or Executive Direction and Administrative Services appropriation.   Therefore the 2020 Appropriations Act does not render DDE functions ineligible for ISDEAA contracting.

92.   Second, BIA partially declined the contract for the CI program to the extent that the budget exceeded $203,846, which is the FY 2020 base funding allocation for the CI program, under 25 U.S.C. § 5321(a)(2)(D). Ex. 8 at 2.   BIA violated the ISDEAA by failing to award the contract for a lesser amount, as required by 25 U.S.C. § 5321(a)(4). Under 25 U.S.C. § 5321(a)(4), Defendants were required to approve any severable portion of the Tribe's contract proposal that does not support a declination finding described 25 U.S.C. § 5321(a)(2), with the level of funding authorized under section 5325(a).

93.   Third, BIA declined the contract under 25 U.S.C. § 5321(a)(2)(A) because "[t]he Tribe's proposal will not deliver satisfactory services."  Ex. 8 at 2-3.   BIA based this conclusion on the Tribe's failure to provide "background materials and training certificates for all Indian country law enforcement officers whom the Tribe is employing or intends to employ to carry out the contract, as required by 25 U.S.C. § 2802(e)(4)(A) and 25 U.S.C. § 2802(e)(1)."  BIA asserted that the lack of qualified staff to carry out the CI function immediately upon award of the contract would endanger the health and safety of all residents and visitors to the Tribe's Indian country.  Ex. 7 at 2.  However, BIA failed to mention:  (a) the Tribe's express agreement to adhere to all applicable laws regarding hiring and

training requirements, *see* Ex. 5 at 2; (b) that any of BIA's objections could have been overcome through the contract itself under 25 C.F.R. § 900.23; (c) the 180-day phase-in period for the CI program previously described by the Bureau, *see* Ex. 3 at 3; and (d) BIA's own statutory requirement to conduct background investigations when requested by a contracting tribe under 25 U.S.C. § 2802(e)(4)(B). Additionally, to the extent BIA required submittal of information beyond that listed in 25 C.F.R. § 900.8, such as the names of staff that will be hired under the contract, BIA violated 25 C.F.R. § 900.9. Therefore, it was erroneous and unlawful for BIA to conclude that the Tribe's proposal "will not" deliver satisfactory services.

94.    Fourth, BIA stated that the Tribe's stated intent to use the TAP Kiosk to complete background investigations, and the Tribe's failure to provide a revised plan to completing employee background adjudications in compliance with federal standards, required BIA to decline the proposal under 25 U.S.C. § 5321(a)(2)(A) because the Tribe "failed to address these minimum requirements for the operation of the program." Ex. 8 at 3. However, BIA failed to note that it is obligated to provide those background investigation services under 25 U.S.C. § 2802(e)(4)(B) or explain why this objection could not be overcome through the contract itself.

Additionally, it is unlawful to decline an ISDEAA contract on the basis that information not listed in 25 C.F.R. § 900.8 is required to be submitted.  25 C.F.R. § 900.9.   Thus, declining the contract under 25 U.S.C. § 5321(a)(2)(A) was unlawful.

95.   Fifth, BIA stated that without details about how the Tribal-run CI program would work with the BIA-run Uniform Law Enforcement, Corrections and Dispatch programs, particularly with regard to information sharing, referral of cases for investigation, dispatch protocols and maintenance of evidence, BIA must decline the contract under 25 U.S.C. § 5321(a)(2)(A).  Ex. 8 at 3.  However, it is unlawful to decline an ISDEAA contract on the basis that information not listed in 25 C.F.R. § 900.8 is required to be submitted.  25 C.F.R. § 900.9.  BIA did not mention its own failure to provide adequate technical assistance to the Tribe by supplying sample language for a Tribal-BIA agreement that would satisfy this requirement or the 180-day phase-in period for the CI program previously described by the Bureau.  Furthermore, BIA did not explain why this objection could not be overcome through the contract itself.  For these reasons, this basis for declining the contract was unlawful.

96.    Sixth, BIA declined the contract under 25 U.S.C. § 5321(a)(2)(A) because the Tribe's proposal did not provide a plan for tribal investigators to obtain federal commissioning or supervision by qualified personnel. Ex. 8 at 3.  However, it is unlawful to decline an ISDEAA contract for the failure to submit information not listed in 25 C.F.R. § 900.8 is required to be submitted. 25 C.F.R. § 900.9.  Also, BIA failed to mention its own failure to provide adequate technical assistance to overcome this objection by not providing the Tribe with any sample agreements or scope of work language that would satisfy this requirement, failed to mention the 180-day phase in period, and failed to explain why this objection could not be overcome through the contract itself.  Thus, this basis for declining the contract has no merit.

97.    Finally, BIA asserted that the Rocky Mountain Regional Office could not make a determination or recommendation to the BIA Central Office to approve or decline the Tribe's pre-award costs request because "the Tribe did not submit a budget." Ex. 8 at 3.  Thus, the Bureau denied the Tribe's pre-award costs request under 25 U.S.C. § 5321(a)(2)(D).  *Id.* BIA failed to acknowledge that the Tribe submitted clarification of the nature and extent of the pre-award costs with its October 9 letter.  Under 25 U.S.C. §§ 5322(a)(2), 5325(a)(6) and 5325(g), and 25

C.F.R. § 900.7, Defendants were required to award the Tribe its requested pre-award costs incurred in preparing the proposed contract, and to provide technical assistance in identifying eligible costs.  BIA violated the ISDEAA by not providing such assistance and not awarding pre-award costs.

98.   Defendants, including BIA, violated the ISDEAA in other ways, including as follows.

99.   Under 25 C.F.R. § 900.29(a), Defendants were required to provide the Tribe with any documents relied upon in making the declination decision, within 20 days of the decision.  Defendants failed to do so.

100. Defendants' declination letter cites 25 U.S.C. § 5321(a)(2)(C) as a declination reason in its introductory paragraph but no further explanation of this declination criteria is provided in the letter.  Thus, to the extent Defendants relied upon § 5321(a)(2)(C) for the declination, they failed to support it with any rationale.

101. As indicated above, under 25 C.F.R. § 900.9, Defendants may not require a tribe to submit information as part of a self-determination contract proposal that is not contained within 25 C.F.R. § 900.8.  Defendants violated this provision by declining the Tribe's proposal because the Tribe failed to submit information not required by 25 C.F.R. § 900.8 or any other regulation.

102.  As indicated above, under 25 U.S.C. § 5328(a)(1) and 25 C.F.R. § 900.5, Defendants may not require a tribe to adhere to nonregulatory requirements as a condition of entering into a self-determination contract.  Defendants violated these provisions by requiring the Tribe to adhere to requirements imposed by an interagency MOU and ad hoc requirements imposed by the Bureau that are not part of any promulgated regulation.

103.  Finally, under 25 U.S.C. § 5321(f), Defendants were required to, at all times, negotiate with the Tribe in good faith and carry out the ISDEAA in a manner that maximizes the policy of Tribal self-determination.  Defendants failed to do so.

## CLAIM I:  DECLARATORY RELIEF (25 U.S.C. §§ 5321, 5322, 5324, 5328, 5331 and 25 C.F.R. Part 900)

1.     The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

2.     Under 25 U.S.C. § 5321, 25 C.F.R. § 900.22 and applicable law, Defendants could only decline the Tribe's self-determination contract proposal for one of the five reasons in section 5321 and must adequately support any declination reason with clear and convincing evidence.  Defendants failed to adequately support

their declination decision and declined the Tribe's proposal for reasons not allowed by section 5321.

3.    The Tribe asks the Court to declare that the Defendants violated the ISDEAA and its implementing regulations through the foregoing actions.

CLAIM II:  MANDAMUS RELIEF (28 U.S.C. § 1361; 25 U.S.C. § 5331)

1.    The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

2.    Under the statutes, regulations and applicable law, Defendants have a non-discretionary duty to approve the Tribe's self-determination contract proposal unless one of the five declination reasons set forth in 25 U.S.C. § 5321(a)(2) applies.

3.    Defendants failed to perform this nondiscretionary duty to Plaintiff. Defendants improperly declined the Tribe's proposal for reasons not allowed under the ISDEAA and/or failed to adequately support the declination of the Tribe's proposal by clear and convincing evidence.

4.    Defendants failed to perform this nondiscretionary duty by failing to approve the severable portion of the Tribe's proposal under 25 U.S.C. § 5321(a)(4).

5.    There is no adequate administrative remedy available to Plaintiff.

<u>CLAIM III: INJUNCTIVE RELIEF (25 U.S.C. § 5331; Fed. R. Civ. P. 65)</u>

1.      The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

2.      Plaintiff asks the Court to order Defendants to enter into a self-determination contract with the Tribe as requested by the Tribe's August 2020, proposal, subject to any alteration in the proposal agreeable to the Tribe under 25 U.S.C. § 5321(a)(4), including award of the Tribe's pre-award costs.

CLAIM IV: EQUITABLE RELIEF

1.      The Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 103 above.

2.      The Tribe spent its own funds to prepare its contract proposal and requested pre-award costs under 25 U.S.C. §§ 5322(a)(2), 5325(a)(6) and 5325(g), and 25 C.F.R. § 900.7.

3.      Defendants improperly denied the Tribe's request for pre-award costs by imposing a nonregulatory requirement upon the Tribe to submit a "budget" for such costs and failing to provide the Tribe with technical assistance.  Because of Defendants' unlawful actions, the Tribe has not been compensated for its reimbursable pre-award costs.

4.      The Tribe seeks reimbursement and restitution from Defendants of funds that the Tribe spent in preparing the proposal, including its pre-award costs.

5.      The Tribe seeks any other equitable relief that it may be entitled to receive under other applicable laws.

## PRAYER FOR RELIEF

WHEREFORE, the Tribe respectfully requests that the Court:

1.      Declare Defendants in violation of the Tribe's rights under the ISDEAA and its implementing regulations;

2.      Order Defendants to enter into a self-determination contract with the Tribe and provide the Tribe with its requested pre-award costs;

3.      Award the Tribe equitable restitution;

4.      Award the Tribe its costs and attorney's fees incurred herein under 28 U.S.C. § 2412 and any other applicable law; and

5.      Award such other relief as the Court deems just and equitable.

Dated this 15th day of December, 2020.

Respectfully submitted,

/s/ Joe A. Rodriguez
Joe A. Rodriguez, MT Bar #2650
P.O. Box 820
Lame Deer, MT 59043-0820
Tel. (406) 477-6315
Fax (877)-605-7446
joearod@aol.com


Brian W. Chestnut, WA Bar #23453 (*pro hac vice* pending)
Beth Baldwin, WA Bar #46018 (*pro hac vice* pending)
ZIONTZ CHESTNUT
2101 4th Avenue, Suite 1230
Seattle, WA 98121
Tel. (206) 448-1230
Fax (206) 448-0962
bchestnut@ziontzchestnut.com
bbaldwin@ziontzchestnut.com

*Attorneys for Plaintiff*